**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. _____

LEIF-ERIK HVIDE,

      Plaintiff,

vs.

HOLT FINANCIAL, LTD.,
HOLDUN FAMILY OFFICE (BAHAMAS)
LIMITED, HOLT ACCELERATOR INC.
HOLT ACCELERATOR, L.P.,
BRENDAN HOLT DUNN,
MARGARET ("MAGGIE") DUNPHY,
JAN CHRISTOPHER ARP, and
GORDON DEMPSEY,

      Defendants.

_____/

## COMPLAINT

Plaintiff, Leif-Erik Hvide, hereby sues Holt Financial, Ltd., Holdun Family Office (Bahamas) Limited, Holt Accelerator Inc., Holt Accelerator, L.P., Brendan Holt Dunn, Margaret ("Maggie") Dunphy, Jan Christopher Arp, and Gordon Dempsey (collectively, "Defendants"), and in support thereof, states as follows:

1.      Plaintiff, Leif-Erik Hvide is an individual resident of Palm Beach County, Florida. Currently he is in Rio de Janeiro, Brazil, under a tourist visa, but unable to safely return to the United States due to the Coronavirus pandemic.

2.      Holt Financial, Ltd. is a Bahamian Corporation doing business in Miami-Dade County, Florida, with a principal place of business in The Bahamas.

3.      Holdun Family Office (Bahamas) Limited is a Bahamian corporation doing business in Miami-Dade County, Florida, with a principal place of business in The Bahamas.

4.      Holt Accelerator Inc. is a Canadian corporation doing business in Miami-Dade County, Florida, with a principal place of business in Montreal, Canada.

5.      Holt Accelerator, L.P. is a Canadian corporation doing business in Miami-Dade County, Florida, with a principal place of business in Montreal, Canada.

6.      Brendan Holt Dunn is an individual resident of The Bahamas.

7.      Margaret ("Maggie") Dunphy is an individual resident of Montreal, Quebec Canada.

8.      Gordon Dempsey is an individual resident of Toronto, Canada.

9.      Jan Christopher Arp is an individual resident of Montreal, Quebec Canada.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 (diversity of citizenship). The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the parties are of diverse citizenship.

11.     As described more fully below, Defendants operate, conduct, engage in, or carry on a business or business venture in this state or have an office or agency in this state.

12.     Defendants are also engaged in substantial and not isolated activity within this state, and this Court may therefore exercise general jurisdiction over Defendants regardless of whether Plaintiff's claims arise from that activity.

13.     Venue is proper in this District under 28 U.S.C § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District, or because there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

## FACTUAL BACKGROUND

**A.  Hvide Meets Brendan Holt Dunn in Miami, Beginning His Relationship with Brendan Dunn and the Holt Entities.**

14.      In the spring of 2018, Hvide was a full-time resident of Miami, Florida, living there with his wife and children. At this time, Hvide was acting as a consultant for a company named Rokk3r Labs (Rokk3r is pronounced "rocker"), and working on various projects in the digital finance space.

15.      One of these projects was a digital asset hedge fund named Rokk3r RAM, of which Hvide was the founding partner.

16.      Another project was a digital asset exchange startup for retail and institutional investors to trade and invest in digital tokens (e.g., Bitcoin). Hvide had an innovative idea for this startup: to protect the exchange with a bank, which would act as a compliance gatekeeper to ensure full transparency, security, and compliance with securities laws.

17.      In May 2018, Jeffrey Ransdell, a business partner of Hvide's associated with a company called Rokk3r Fuel ExO, introduced Hvide to Brendan Holt Dunn, who agreed to meet Hvide in person to discuss investing in  Hvide's hedge fund and exchange startup.

18.      Brendan Holt Dunn is a wealthy entrepreneur: a founder, CEO, and managing partner (among other roles) of various companies in several countries including Canada and the Bahamas.

19.      As advertised on the websites of several of Brendan Dunn's companies, he is the great grandson of Sir Herbert Holt, a late-19th/early-20th Century Canadian entrepreneur and former president of the Royal Bank of Canada (among other accomplishments and distinctions).

20.      Brendan Dunn's businesses are for the most part family-run, closely held, and controlled by descendants of Sir Herbert Holt and their close relations and associates. These

3

businesses proudly boast, and tout the virtues, of being closely held and family run, and of the officers' and members' descendancy from Sir Herbert Holt.

21.     On May 24, 2018, Hvide and Brendan Dunn met in person, at 1395 Brickell Avenue, Miami, FL, in the restaurant of the Conrad hotel, to discuss Hvide's business ideas—the hedge fund and exchange startup—and the possibility of Brendan Dunn investing in them.

22.     Brendan Dunn agreed that he, through various entities, would fund Hvide's digital asset exchange if Hvide could meet again in a few weeks with a well-developed business presentation. Brendan Dunn also agreed to invest in the Rokk3r RAM hedge fund.

23.     Brendan Dunn met Hvide again in Miami on June 5, 2018, in the Conrad Hotel's restaurant at 1395 Brickell Avenue, to review Hvide's business plan. There Brendan Dunn confirmed he would back Hvide's hedge fund and exchange startup through various entities.

24.     The digital asset exchange was incorporated on June 8, 2018, in The Bahamas, as "Digital Asset Management Limited." The entity would operate under the d/b/a "Dunrok."

25.     On June 11, 2018, Brendan Dunn, writing from his e-mail address as CEO of Holdun Family Office (Bahamas), stated, "we are setting up the [digital asset exchange] company and bank account, so please proceed ASAP with starting the launch."

26.     During the following few months, Hvide continued to develop the Rokk3r RAM hedge fund and pushed Brendan to assist in its opening too, as Brendan Dunn had committed.

27.     Although the hedge fund would ultimately be opened, as RAM Digital Asset Fund GP Ltd, Hvide was not given shares in it and was eventually guided to stop working on the hedge fund business, which he had proposed and helped create.

28.     Instead, Hvide was instructed to focus on Dunrok and other businesses and ventures associated with Brendan Dunn. This would be the first of several instances where Hvide was cut

off from ownership or involvement in a business or venture that he proposed or started and helped build.

**B.   Hvide's Introduction to and Work for Other Holt Companies.**

29.     As Hvide began working with Brendan Dunn, and working on Dunrok, Brendan Dunn started introducing Hvide to his family and business associates with whom he ran and controlled various companies, including Stuart Dunn (Brendan's father), Peter Dunn (Brendan's uncle), Kat Dunn (Brendan's spouse), and Defendants Maggie Dunphy, Jan Arp, and Gordon Dempsey.

30.     One of these companies is Defendant Holt Accelerator, Inc. As an "accelerator," Holt Accelerator provides capital, investments, services, and other support to startup financial technology (or "fintech") companies in exchange for a stake in the startup companies.

31.     Another one of the companies that Hvide was introduced to was Holdun Family Office, which provides wealth management and investment services, and is otherwise closely connected with Holt Accelerator and the other Holt companies.

32.     Hvide was also introduced to Carlos Ulloa and James Caprio who oversee the Holdun Income Fund, a Holt-affiliated private investment fund, and were developing the idea of a Holdun Real Estate Fund.

33.     As described more fully below, from the early stages of his relationship with Brendan Dunn, Hvide began performing substantial work for not only Dunrok, but also for Holt Accelerator, Holdun Family Office, the Holdun Income Fund, and the Holdun Real Estate Fund.

34.     Hvide working for, or advising, several "Holt" companies ("Holt" companies is used herein for ease of discussion to refer to the various Brendan Dunn-affiliated companies for

whom Hvide worked), even though he was nominally employed by only one of them, was consistent with how the various Holt companies operate.

35.     The websites of the companies themselves tout their interrelatedness—how they are family run and interconnected.

36.     For example, the website of Holt Financial says, "Our combined legacy includes the Holdun Family Office and the Holt Accelerator, an AI and Fintech accelerator."

37.     The website of Holt Accelerator proclaims it is "backed by Holdun" and "backed by the 5th Generation Family Office Holdun." In describing Brendan Dunn, the Holt Accelerator website describes him as  "the CEO of *Holdun*, a 5th generation family business which offers family office services, wealth management services, trust services, corporate services, concierge services and financial services and was awarded best Multi-Family Office in the Caribbean 2017 for Holdun Family Office." (emphasis added).

38.     The website of Holdun Family Office states, "Holdun Family Office is solely controlled by the Dunn and Meier families and no other institutions."

39.     There are several "Holdun Family Office" entities—including in Delaware, Canada, Florida, and the Bahamas. But the Holdun Family Office website makes no distinction between them except to describe different locations.

40.     All of the Holt companies' websites tout the family legacy of Sir Herbert Holt, and the family-run nature of the business.

41.     As Hvide would later find out, Brendan Dunn and other prominent officers and directors of the various Holt companies acted on behalf of all of the companies as one large enterprise, making no apparent distinction between actions on behalf of one company as opposed to the other.

42.     Among other examples described herein, Brendan Dunn and other prominent officers and directors of the various Holt companies would use one company's e-mail address to conduct business on behalf of another company.

43.     Furthermore, on information and belief, some or all of these various companies intermingle their finances, either by operating out of one "wallet" that underwrites some or all of these enterprises, or by at least using the resources of one company to support another, regardless of domicile, participation by outside investors, shareholder obligations, or other conflicts of interest.

44.     Brendan Dunn or other prominent officers and directors of the various Holt companies would meet weekly over the phone or in person to have global strategy meetings, discussing and planning the business of all of the various Holt companies as one undifferentiated family enterprise.

45.     As Hvide became more involved, he would meet with various combinations of Brendan Dunn, Maggie Dunphy, Stuart Dunn, Gordon Dempsey, Michael Blank, Carlos Ulloa, or others on average once per month. Such meetings, when held, were commonly held in Miami—a natural and convenient meeting point for officers and directors of the various Holt companies to meet, being that many of them were in the Bahamas, and that Brendan Dunn lives in the Bahamas.

**C.  Hvide's Role as CEO of Digital Asset Management Limited (Dunrok).**

46.     From the beginning of his involvement with Dunrok, Hvide worked full-time in the Wynwood neighborhood of Miami, in a shared workspace rented by Rokk3r Fuel ExO, whose executives were also beneficiary owners of Dunrok (described below).

47.     Brendan Dunn and Hvide agreed Dunrok's ownership structure would be:

a. 35% to Bally Crystal Investments Limited—which Brendan Dunn owned or controlled.

b. 5% to Holdun Limited—on information and belief, a company associated with the Holt companies.

c. 5% to Acacia Tree Holdings Limited—A holding company owned or controlled Kelly Nottage, an attorney who performs work for Brendan Dunn and various Holt entities.

d. 45% to R3RAM, Ltd—a Bahamian holding company whose shareholders were:

    i. 20% Hvide (equating to 10% of Dunrok)

    ii. 20% Jeffrey Ransdell

    iii. 20% Nabyl Charania

    iv. 20% German Montoya

    v. 20% Rokk3r Inc.

e. 10% treasury for investors (it is from this pool that Brendan placed Holdun Opportunity Fund Limited for its investment in Dunrok).

48.    Among other responsibilities, Brendan Dunn directed the initial funding for the company, in an amount of $457,500.00, to come from Holdun Opportunity Fund, Ltd.—a Bahamian investment fund Brendan Dunn is associated with.

49.    Holt entities continued to fund Dunrok's operation over the subsequent months through investments by Holdun Opportunity Fund ($1,000,000.00 total) and Holdun Investments Inc. ($500,000.00).

50.    Brendan Dunn agreed on July 24, 2018, that Hvide would be Dunrok's CEO.

51.    After Hvide's appointment to the position of CEO:

a. Brendan Dunn appointed his controller, Gordon Dempsey, a Canadian national, as CFO for Dunrok in August 2018.

b. On Hvide's recommendation, Daniel Casanas (a U.S. citizen and Miami resident) was brought onboard as COO in August 2018.

52.    Through the efforts of an executive recruiter hired by Dunrok:

a. Marc Bonorino (a U.S. Citizen) was hired as chief compliance officer (CCO) in September 2018. Bonorino moved from Virginia to Miami for this position.

b. Bomi Song (a U.S. Citizen and New Jersey resident) was hired as chief marketing officer (CMO) in November 2018.

53.    In July 2018, CFO Gordon Dempsey traveled from Canada to Miami to meet with Hvide and his team. Dempsey continued to come to Miami at least monthly thereafter. During these meetings, Dunrok's financials were developed and discussed, presentations were made to potential investors, and other critical strategic and business decisions were made for Dunrok.

54.    As CEO, Hvide was responsible for leading the development and execution of Dunrok's long-term strategy with a view to creating shareholder value. He was also responsible for day-to-day management decisions and for implementing Dunrok's long- and short-term plans. Hvide acted as a direct liaison between Dunrok's board of directors and management, communicating to the board on behalf of management. Hvide also communicated on behalf of Dunrok to shareholders, employees, government authorities, other stakeholders, and the public, and developed advantageous business relationships with those individuals and entities.

55.    As CEO, Hvide spearheaded the development of the digital exchange and banking platform, negotiated partnership agreements, met with and raised capital from investors, and oversaw the development of the company's branding and marketing plan.

56.     Hvide's progress was measured and updated to the teams at Rokk3r Labs, Rokk3r Fuel ExO, and Dunrok (as well as other individuals associated with Brendan Dunn and Holt entities) on a twice-weekly basis through scheduled conference calls and board meetings. Often physically present in Miami at these meetings were:

    a.   Hvide (CEO).

    b.   Daniel Casanas (COO, Miami resident).

    c.   Marc Bonorino (CCO, Miami resident).

    d.   Gordon Dempsey (CFO, Canadian resident).

    e.   Nabyl Charania (Shareholder/Director, Canadian, Miami resident).

    f.   Jeffrey Ransdell (Shareholder/Director, Miami resident).

    g.   German Montoya (Shareholder/Director, Miami resident).

57.     Often dialing in remotely to these calls, from The Bahamas or Canada, were:

    a.   Brendan Dunn (Shareholder/Director).

    b.   Maggie Dunphy (Shareholder/Director).

    c.   Stuart Dunn (Shareholder).

58.     A Dunrok board meeting was held in person on September 1, 2018, at the conference room of the Sheraton Cypress Creek in Ft. Lauderdale. Present at that meeting were Brendan Dunn, Stuart Dunn, Hvide, Jeffrey Ransdell, Gordon Dempsey, and Nabyl Charania.

59.     After this meeting, Brendan Dunn decided Hvide should be relocated with his family to The Bahamas to preserve Bahamian jurisdiction for Dunrok and be closer to Brendan Dunn and his offices at Albany Financial Center.

60.     Brendan Dunn invited Hvide to come to Nassau (The Bahamas) with his family at the end of September 2018, on an expatriation exploration trip to make Hvide's wife and children

comfortable with the idea of uprooting the family from Miami and moving to The Bahamas. Brendan Dunn told Hvide he would "take care of everything," which ended up involving accommodations, tours of schools for Hvide's children, tours of homes for Hvide and his family to live in, and a welcoming barbeque at Brendan Dunn's home to meet his wife and children.

61.     Hvide traveled with his family to Nassau during the first week of October 2019, and they were put up in a hotel at the Baha Mar, which was arranged by Brendan Dunn.

62.     Hvide attended business meetings during this Bahamas trip as well, including with Brendan Dunn, Gordon Dempsey, Maggie Dunphy, Marc Bonorino, and Daniel Casanas, concerning Dunrok.

63.     Throughout the trip, Hvide paid for his trip out of pocket and at the end of the stay was presented with a bill for accommodations.

64.     Hvide sent in an expense report for this relocation trip to Gordon Dempsey, but Gordon Dempsey refused to reimburse Hvide for these expenses, instead stating they were Hvide's responsibility.  This would be the first of many times that Holt through Gordon Dempsey would either refuse to pay Hvide's invoices, delay them unreasonably, or pay only partial amounts.

65.     in October/November 2018, Brendan Dunn began taking certain actions, which, on information and belief, were designed to consolidate control over Dunrok:

66.     During a telephonic board meeting on November 9, 2018, Brendan Dunn proposed that Marc Bonorino would stop being a Dunrok employee, but would become an employee of Holdun Bahamas and leased to Dunrok. At this time, Hvide and Dunrok's executive team were still intending to move to the Bahamas.

67.     During a telephonic board meeting on November 16, 2018, the board approved Marc Bonorino to become the CCO for both Holdun and Dunrok.

68.     On information and belief, Mr. Bonorino, as CLO for Holdun was tasked with investigating Rokk3r's participation in Dunrok.

69.     On November 23, 2018, during a telephonic board of directors meeting, it was resolved that the then-current Board of Directors—which included Brendan Dunn as Chairman and Jeff Ransdell as Director—would be revised to include Stuart Dunn, Maggie Dunphy, Gordon Dempsey, Hvide and Nabyl Charania. This change put the balance of control of the board of directors in Brendan Dunn's hands as four of the members were either related to Brendan Dunn or were officers or directors of Holt entities, two of the members were executives of Rokk3r Fuel ExO, and Hvide was the CEO.

70.     During this time period, it was proposed by Brendan that for compliance reasons, Nabyl Charania, Jeff Ransdell, and German Montoya could not be shareholders of Dunrok and thus, R3Ram, Ltd should be removed from the shareholder registry and the shares redistributed.

71.     On December 10, R3RAM, Ltd. was removed from the shareholder list and shares in Dunrok were re-distributed as follows:

    a.  1,777 shares (35.5% of the equity) issued to Bally Crystal Investments Limited, Brendan Dunn's holding company.

    b.  90 shares (1.8% of the equity) issued to Acacia Tree Holdings Limited, Kelly Nottage's holding company.

    c.  68 shares (1.4% of the equity) issued to Margaret Dunphy.

    d.  68 shares (1.4% of the equity) issued to Gordon Dempsey.

    e.  22 shares (0.4% of the equity) issued to Spyder Whitney, a holding company of Brendan Dunn's brother Whitney Dunn.

f.  1,224 shares (24.5% of the equity) issued to a new holding company, Digital Asset Holdings, which based on information and belief, is owned or controlled by Brendan Dunn.

g.  405 shares (8.1% of the equity) issued to DRK MGMT Limited, a new holding company that Hvide was instructed by Brendan to open using Kelly Nottage as his agent. This change represented a share reduction to Hvide of 10%, or 45 shares from his share ownership via R3RAM, Ltd. which owned 2,250 shares of which 20% (450 shares) were owned by Hvide.

h.  351 shares (7.0% of the equity) issued to Rokk3r Inc.

i.  45 shares (0.9% of the equity) issued to Rokk3r Fuel

j.  100 shares (2.0% of the equity) were sold to Holdun Opportunity Fund for $1,000,000.00 ($10,000/share)

k.  50 shares (1.0% of the equity) were sold to Holdun Investments Inc. for $500,000.00 ($10,000/share)

l.  4,200 shares were issued in Digital Asset Management, with an additional 800 shares in treasury for a total of 5,000 shares, giving the company a total market value of $50,000,000.00.

72.  As a result, Brendan Dunn, through two companies, Bally Crystal and Digital Asset Holdings, owned 60% of Dunrok and together with Whitney, Nottage, Dunphy, Dempsey, the Holdun Opportunity Fund, and Holdun Investments Inc. controlled a supermajority of the company.

73.  In December 2018 Hvide, Marc Bonorino, and Daniel Casanas were moved to an office at 1395 Brickell Avenue.

74.     On information and belief, this office was maintained by one of the Holdun Family Office entities.

75.     At the beginning of December 2018, subscription agreements went out to Rokk3r Fuel, Holdun Opprtunity Fund, and Holdun Investments Inc.

76.     Rokk3r Fuel subscribed for $1 million, Holdun Opportunity Fund subscribed for $1 million, and Holdun Investments Inc. subscribed for $500,000.

77.     As head of compliance, Marc Bonorino was tasked with a compliance review of the equity investments in Dunrok.

78.     In December 2018, Rokk3r Fuel ExO's first capital investment into Dunrok, which had been wired from Rokk3r Fuel, ExO to Digital Asset Management's account in The Bahamas, was rejected for compliance reasons and returned to Rokk3r.

79.     At the same time, investments from Holdun Opportunity Fund Ltd and Holdun Investments Inc. for $1 million and $500,000 were approved and accepted. These investments validated the company valuation of $50 million, with a purchase price of $100/share. This established a value for Hvide's shares in Dunrok of approximately $4 million.

80.     By the end of December 2018, Hvide, Rokk3r, and his team had achieved its goals and had prepared Dunrok for a market launch:

a.  As of December 12, 2018, the marketing plan developed by Hvide, Bomi Song, and a Miami-based marketing agency was ready to launch in January 2019 with a press release, a public relations tour of Asia, website, and marketing materials.

b.  As of December 17, 2018, a software platform that had been developed by Hvide, Rokk3r, and a third-party software development company was in the

final stages of beta testing and was ready for public release to markets in Asia and Australia in January.

c.  After months of negotiations and a trip to Los Angeles to meet with their CEO, Marc Wade, Hvide signed a cross-marketing and cross-investment agreement with a stock trading app company in California called White Shark, which was projected to provide Dunrok with at least 100,000 clients.

d.  Using standard industry metrics for digital banking valuations of approximately $1,000/client this agreement together with Dunrok's readiness to launch, boosted the value of Dunrok to over $100 million.

e.  Hvide and his team had also had lined up investors for a subsequent equity raise at this $100 million level, which included Marc Wade and other third-party investors.

81.  Following the compliance rejection of Rokk3r's investment, Hvide, Marc Bonorino, and Daniel Casanas mapped out potential paths forward and suggested continuing to operate Dunrok, buy out the shareholders of Rokk3r Inc. and Rokk3r Fuel ExO in order to regain full control over the software codebase, and launch the company to the public in February 2019.

82.  On information and belief, including facts alleged below, Brendan Dunn, Maggie Dunphy, Stuart Dunn, and Gordon Dempsey met during the end of December and/or the beginning of January and decided to dissolve Dunrok, reconstitute the company under a new name, Holt Financial, and conspired to remove equity from persons and companies not affiliated with the Dunn family or Holt entities.

83.  On January 11, 2019, after he had achieved majority control, Brendan pushed through a resolution to allow Digital Asset Management through a simple majority vote (Brendan)

to wind up the company without the consent of any other shareholders or directors. Hvide was coerced by Brendan into signing this document in order to demonstrate his loyalty to the family and maintain his position and benefits.

84.     This resolution would have passed whether Hvide signed it or not, insofar as it provided that "[a]t least three of the four shareholders are to sign this written consent for same to be valid."

**D.  Dunrok is Changed to Holt Financial, Ltd.; Hvide's Status and Shares are Diminished**.

85.     In January 2019, Hvide was told by Daniel Casanas that the decision was made to:

a.  Dissolve Dunrok and reconstitute it as "Holt Financial, Ltd."

b.  Diminish Hvide's status and salary.

c.  Remove Hvide as CEO, giving him the title of "Global Head of Strategy."

d.  Reduce Hvide's shares from 8.1% to 4%.

e.  Not pay Hvide his accrued, unpaid, and in arrears salary for the previous two months.

86.     Brendan Dunn assumed the title of CEO of Holt Financial, a position he holds to this day.

87.     Hvide was not given any explanation or reasoning for the reduction in his position and benefits. Brendan refused to speak with Hvide directly about it and directed all questions to Daniel Casanas.

88.     Hvide was informed that he should be grateful that he got to keep any equity at all and still had a job and health insurance because Brendan Dunn and the Holt companies decided to keep Hvide onboard as a shareholder and employee only out of the kindness of their hearts and the

understanding that Hvide would develop the Holdun Real Estate Fund and other new opportunities for Brendan Dunn and the Holt entities.

89.     By placing Hvide into a tenuous financial and personal position and threatening him with dismissal and termination of healthcare, Hvide was unable to contest these adverse actions and was forced to accept them.

90.     At the time that it was decided to dissolve and reconstitute Dunrok as Holt Financial, Hvide's 8.1% shares had a market value of $8,100,000.00.

91.     Hvide's demotion, equity cut, paycut, and unpaid travel expenses caused tremendous emotional distress, which, together with later actions by the Defendants would lead to Hvide's alienation and eventual divorce from his spouse, and separation from his children.

92.     Hvide also incurred substantial late fees, interest, and penalties from his mortgage lender and credit card companies. Eventually, Hvide would default on his mortgage with a foreclosure filing on his family's home.

93.     Thus, similar to how certain of the defendants made commitments to Hvide and claimed to be "partnering" with him to develop the RAM Digital Asset Fund, only to be cut off, these defendants made promises to Hvide and claimed to be partnering with him, to get him to fully develop Dunrok, only to constrain him financially and cut him out, once the lion's share of the work had been performed.

**E.  Hvide Continues to Work for Holt entities.**

94.     After the dissolution of Dunrok, and as Global Head of Strategy, Hvide continued to work out of the office at 1395 Brickell Ave and was given keys and a keycard to that office for his use whenever he was in Miami.

95.     Just as when he was CEO of Holt Financial, now that he was Global Head of Strategy, Hvide continued to work for Holt Financial, Holdun Family Office, Holt Accelerator, and Holdun Real Estate Fund. Hvide was given e-mail addresses for Holt Accelerator, Holt Financial, and Holdun Family Office.

96.     For example, on March 25, 2019, at a conference room in the Hampton Inn, two blocks from 1395 Brickell in Miami, Florida, various officers and directors of Holt entities held a "Holt Executive Meeting."

97.     The attendees included Brendan Dunn, Margaret Dunphy, Jan Arp, Marc Bonorino, Daniel Casanas, Carlos Ulloa, Gordon Dempsey, Michael Blank, and Hvide, and various other officers and directors of Holt entities.

98.     The attendees discussed comprehensive plans for the integration and collaboration of all of the Holt companies, including Holdun Family Office, Holt Financial, and Holt Accelerator, Inc. During this meeting, it was decided that a conference call would take place with the attendees of this meeting every Friday morning thereafter to review the status and strategies of the Holt companies.

99.     Meanwhile, in or about July 2019, Holdun Family Office incorporated a Florida LLC and opened an office in Miami. This was reported as an "expansion" of the various Holdun Family Office entities into Miami. This entity is a Registered Investment Advisor (RIA), offering wealth management services to U.S. Citizens. Employees of this company include Michael Blank, President and Guisseppe Mazzeo, CIO. Incidentally, this was also a business idea that Hvide proposed to Brendan Dunn back in the summer of 2018—another business opportunity that Hvide brought to Holt and in which he was not included or compensated for.

**F.  Hvide's Work For Holdun Real Estate Fund**

100.    After Dunrok was dissolved, when Hvide was informed of his reduction in status and revised role with Holt, Hvide was offered the opportunity to take over development of the Holdun Real Estate Fund.

101.    Hvide had been working on the Holdun Real Estate Fund since the summer of 2018 with Carlos Ulloa and James Caprio, who ran the Holdun Income Fund and were looking into the idea of a commercial real estate fund for Holdun.

102.    Hvide was asked to assist on this project as he had previous experience launching and running a real estate fund. Brendan promised by teleconference that Hvide would receive equity participation in the fund.

103.    Hvide had previously prepared a proposal for the fund, which was completed and delivered in August 2018.

104.    Now, in the aftermath of Dunrok's dissolution and Hvide's reduction in salary and status, Hvide prepared and delivered the first draft of the offering memorandum for the Holdun Real Estate Fund.

105.    Throughout February 2019, and whenever Hvide was in Miami, he continued to work with Carlos Ulloa, James Caprio, and Marc Bonorino in South Florida, mostly at the 1395 Brickell office, to further develop the fund, assist with investor presentations and strategize the fundraising.

106.    Hvide's work included redrafting the prospectus using Cayman law, based on Hvide's idea to move the fund's domicile from The Bahamas to The Cayman Islands because The Cayman Islands offered an umbrella fund structure (segregated portfolio company, or "SPC") that would be cost effective for opening additional funds in the future.

107. On February 27, 2019, Phil Stewart, Senior Vice President of Holdun Family Office (Cayman) Limited, asked Brendan Dunn for an update on the real estate fund. Brendan Dunn copied Hvide on his reply to Phil Stewart, that in reference to the Holdun Real Estate Fund, "Leif is the boss of this."

108. During the months of March and April, 2019, Hvide continued to work with Ulloa and Caprio on the fund as well as Phil Stewart on capital raising efforts.

109. In early March, 2019, a law firm in Cayman was retained to formalize and incorporate the fund. They provided a detailed questionnaire to get started on this process and Hvide was tasked with completing it.

110. On March 14, 2019, Gordon Dempsey refused to pay Hvide's expense report and Hvide was forced to go to Brendan Dunn to get this resolved.

111. On March 20, 2019, Hvide delivered the draft prospectus and completed the fund questionnaire.

112. After delivering the prospectus and questionnaire, Hvide was excluded from further development of the fund, and was given only vague explanations to the effect that he would be "taken care of," on the understanding that he continued to work on various other projects for the Holt entities and family.

113. On March 27, 2019, Gordon Dempsey again refused to pay Hvide's expense report and Hvide was forced to go to Brendan Dunn to get this resolved.

114. Furthermore, from February through May, Holt arbitrarily and without explanation refused to pay Hvide's travel expenses of more than $4,000 during any calendar month. By May 15, 2019, these accrued unpaid expenses totaled $4,470.28, which Hvide had to pay out of pocket,

further exacerbating Hvide's personal financial situation, marriage, as well as his physical and emotional health as described previously.

115.    Holdun Real Estate Fund was opened in August 2019 and Hvide was not given participation or recognition in the fund despite Brendan Dunn's prior representations.

116.    Hvide's exclusion from the Holdun Real Estate Fund is the second example where Hvide proceeded in good faith based on representations by Brendan Dunn and other defendants to develop a business opportunity for the Holt entities and family, who then constrained him financially, and cut him out of the deal once the lion's share of the work had been performed.

**G.  Hvide's work on the Aborted Opportunity with Dacasa**.

117.    One of Hvide's first assignments as Global Head of Strategy was to accompany Marc Bonorino and Daniel Casanas on a business development trip to Brazil in late January 2019, to explore opportunities for all Holt companies there. They attended business development meetings in Sao Paulo, Rio de Janeiro, and Vitoria. Marc Bonorino organized the trip and meetings. During this trip, opportunities were explored for Holdun Family Office, Holdun Opportunity Fund, Holt Income Fund, Holt Accelerator, and Holt Financial.

118.    Hvide returned to Miami during January 29 to February 3, 2019, and worked from the office at 1395 Brickell Avenue in Miami. At this office, Hvide worked extensively on the Holdun Real Estate Fund as well as opportunities for Holdun in South America.

119.    Brendan Dunn subsequently gave Hvide approval to return to Brazil during February 3 to 8, 2019, to explore the possibility of Holt Financial acquiring Dacasa Financeira— a micro-lender from Vitoria, Espirito Santo, Brazil, which needed a capital infusion and which offered Holt a beachhead into Brazil with close to 1 million active clients for Holt Financial's digital bank.

120.     This was an opportunity Hvide identified while visiting Vitoria, Espirito Santo, Brazil, and proposed to Brendan Dunn, who approved and directed Hvide to pursue it.

121.     Other purposes of Hvide's trip included to explore opening Holdun Family Office in Brazil to distribute the Holdun Opportunity Fund, Holdun Real Estate Fund, and Holdun Income Fund. Hvide was also instructed to explore the possibility of opening Holt Accelerator in Brazil as well.

122.     Hvide formed relationships with Dacasa's principals and orchestrated a deal to be executed. Hvide traveled from Miami to The Bahamas on March 5, 2019, to present the Dacasa opportunity to Brendan Dunn, Maggie Dunphy, and Stuart Dunn.

123.     In this presentation, Hvide discussed the capital requirement of $48.6 million needed from Holt Financial, the fact that Dacasa needed to be rescued, and the potential size of the opportunity. According to the terms of the deal that Hvide negotiated, Holt Financial Limited would acquire 51% of Dacasa in exchange for a rescue package where Holt Financial would buy the shares for $1.00 and transfer approximately $50 million to Dacasa's balance sheet in order to resolve Central Bank's minimum capital requirements for lenders. Dacasa got into that situation as a result of mismanagement by the former CEO and was under a time crunch to resolve the financial crisis as well as other governance and control issues before the Central Bank of Brazil closed the operation.

124.     During this meeting with Brendan, a memorandum of understanding (MOU) between Holt Financial Limited and Dacasa was drafted with full knowledge of the capital required to close a deal as well as the problems with Dacasa that would need to be resolved.

125.     On March 6, 2019, Brendan signed the MOU with Dacasa, which they countersigned and returned to Holt on March 11, 2019.

126.    On March 13, 2019, Dacasa outlined the next steps needed to close the deal, which were shared with Brendan Dunn, Marc Bonorino, Maggie Dunphy, and others. Brendan acknowledged these requirements and offered to help.

127.    Hvide was to be in charge of the operation to convert Dacasa to a digital bank and was promised equity participation by Brendan Dunn.

128.    Brendan Dunn arranged for an entity called Holt Advisory (Worldwide) Cayman Limited to hire Dan Kraft, a Brazilian-Canadian lawyer and his team to initiate a due diligence review of Dacasa.

129.    Holt and Brendan Dunn were very enthusiastic about this deal and on March 30, 2019, Brendan and Hvide were invited to come to Brazil to meet with the Dadalto family that owned Dacasa as well as a tour of the operations.

130.    Hvide and Brendan Dunn traveled to Brazil on April 10, 2019, and spent two days in Vitoria Brazil—April 11 and 12, 2019—meeting with the family, touring Vitoria, touring Dacasa, and meeting with Dacasa management.

131.    Shortly thereafter, Hvide was informed by Brendan Dunn that Holt Financial did not have the financial assets required to complete the transaction, so Hvide took the initiative to find alternative funding partners. This would have required that Holt entities and individuals take a minority stake.

132.    At the end of April, the due diligence report on Dacasa came back highlighting the problems that Dacasa had with governance and capital requirements of Central Bank (the very same problems which made the deal available in the first place).

133.     On information and belief, it was the fact that with the knowledge that Brendan Dunn and Holt family and entities would no longer take the lead controlling role in Dacasa, that Brendan Dunn lost interest in the deal and used the due diligence process as a way out.

134.     A meeting with the CEO and lawyers of Dacasa was held on May 7, 2019, in Rio de Janeiro, attended by Hvide and Marc Bonorino, who were tasked with informing the CEO of Dacasa, Leo Dadalto, that Holt would not be proceeding with the deal as a result of the due diligence findings.

135.     As a result of Brendan Dunn deciding not to move forward with the deal, Hvide lost face with Dacasa, and the advantageous business relationships he had developed in Vitoria, suffering reputational damage.

136.     Hvide continued to work and try to salvage the deal. As of a June 3, 2019, report Hvide prepared, he had five different potential investors for the deal, as well as an opportunity to break up the company and sell the credit card piece to finance the acquisition, but Brendan Dunn was no longer interested in the deal and instructed Hvide to pursue other business opportunities.

137.     Mr. Hvide's personal life and health was severely impacted by his work for Brendan Dunn and the Holt companies during this time. Hvide's wife could not forgive Hvide for Holt Financial demoting him as CEO, taking 60% of his shares in Dunrok, not paying for the expatriation trip to the Bahamas, and unpaid salary. Adding to this, constant travel, Hvide and his wife separated in March 2019. Mrs. Hvide eventually filed for divorce in November 2019. Hvide has lost custody of his children as a result has only visitation rights as of this time. These events have also negatively impacted Hvide's physical and emotional health, leading to frequent panic attacks and autoimmune inflammatory disorders of the skin and scalp. Hvide visited with his family doctor during this time for help with these conditions.

138.    When the Dacasa deal fell through, it was conveyed to Hvide through Daniel Casanas that if he did not put together another deal or opportunity quickly he would be fired and his family's health insurance would be cancelled.

**H. Hvide's work for Holt Accelerator and The Brazil Accelerator Project**.

139.    As previously mentioned, one of the Holt companies Hvide worked for from the early stages of his relationship with Brendan Dunn was Holt Accelerator.

140.    On June 8, 2018, Brendan Dunn assigned Hvide to be Holt Accelerator's representative and to be a speaker at a fintech and blockchain conference in Grand Bahama from June 21-22, 2018.

141.    At the conference in Grand Bahama, Hvide met with the Minister of Grand Bahama, as well as numerous other investors and players in the fintech space, which he introduced and encouraged to apply to Holt Accelerator.

142.    As of August 2018, the Holt Accelerator website showed Hvide as a member of the Holt Accelerator team.

143.    Throughout 2018, Hvide played a key role in the development of Holt Accelerator and was instructed by Brendan Dunn and Jan Arp to:

a.    Assist in the development of the selection process and methodology for Holt Accelerator prior to their first acceleration program in August 2018.

b.    Fly to Canada to participate in the first selection day event in August of 2018 as a key advisor.

c.    Select finalists for the first round of portfolio companies for Holt Accelerator in September 2018.

    d.   Meet in Miami with the Florida-based Holt Accelerator portfolio companies and prospects in September, October, and November 2018.

    e.   Consult remotely for other Holt Accelerator portfolio companies and prospects.

    *f.*   Negotiate and agree to terms for Holt's investment in these portfolio companies as well as provide acceleration advisory services. These companies included Fundseeder (a Boca Raton, Florida based company) and Consilium Crypto.

    g.   Participate in the Holt Fintech Show in Montreal in December 2018.

144.    In 2019, as Hvide began working out of Florida on other opportunities for the Holt companies targeting South America, Hvide continued to work as an advisor for Holt Accelerator and to explore the idea for Holt Accelerator to open in South America.

145.    Among other things, Hvide investigated office locations for Holt Accelerator Brazil; made presentations to potential partners and investors; and organized and attended meetings with Jan Arp with these advantageous business relationships that Hvide had developed.

146.    At the beginning of May 2019, under the ultimatum Hvide received after the Dacasa deal fell through (find and develop a new opportunity for Holt or be terminated), Hvide proposed to move forward with Holt Accelerator Brazil as he had already done some groundwork on this line of business.

147.    Brendan Dunn and the Holt entities agreed this was a good course of action, so long as Hvide could demonstrate there was quantifiable demand from investors and partners to support the project.

148.    As with Hvide's other efforts until this time, his work in Florida together with Marc Bonorino toward developing the accelerator in Brazil was done on behalf of the various Holt entities: Holt Accelerator, Holt Financial, and Holdun Family Office.

149.     Building a Holt Accelerator franchise in Latin America involved a significant, months-long effort to build relationships with private and governmental investors.

150.     On May 28, 2019, Hvide flew from Miami to Brazil with the blessing and requests of Jan Arp, Maggie Dunphy and Brendan Dunn to start working on securing letters of intent from investors, governments, funds, universities, and other corporate partners.

151.     As of June 7, 2019, Hvide had proven enough interest to convince Jan Arp to schedule another visit to Brazil with Hvide during the week of June 23, 2019.

152.     The week of June 23, 2019, Jan Arp and Hvide attended meetings in Belo Horizonte and Sao Paulo. These meetings included a meeting with Helder Fonseca of the law firm GVM Advogados to explore the structure and setup of a possible Holt accelerator in Brazil.

153.     On June 28th, Hvide returned to the USA to continue work on the accelerator.

154.     On July 3, 2019, Jan Arp e-mailed Hvide a draft presentation, presenting Hvide as the head of Holt Accelerator Brazil and the Global Head of Strategy for Holdun Family Office.

155.     On July 8, 2019, Hvide was invited to go to Montreal to present at the upcoming board meeting of Holt Accelerator in Canada as well as selection day for the 2019 Accelerator teams. Hvide attended and participated in the selection event as an advisor as well as attending private dinner with Brendan Dunn, Maggie Dunphy, Jan Arp, and Stuart Dunn.

156.     As part of Hvide's trip, he spoke with representatives of Holt Accelerator, L.P., as well as the board of Holt Accelerator, Inc., to present the Brazil project, including the various letters of intent executed up to that point.

157.     Holt Accelerator L.P. later paid legal bills to facilitate the Brazil Accelerator project. On information and belief, Holt Accelerator L.P. was intended to benefit from the Brazil Accelerator project.

158.     Hvide is also aware of the involvement of an entity called Holt Accelerator GP Inc. On information and belief, Holt Accelerator GP Inc. is set up as an investment manager for Holt Accelerator, L.P., is owned or controlled by Brendan Dunn and Maggie Dunphy either individually or through various entities, and was also intended to benefit from the Brazil Accelerator project.

159.     As a result of Hvide's presentations to Holt Accelerator L.P. and Holt Accelerator, Inc., he received the Defendants' blessing to proceed with the Brazil accelerator project ("Holt Accelerator Brazil").

160.     On July 26, 2019, Hvide on behalf of Holt Accelerator, Inc. and Bernardo Annoni on behalf of FUNDEP signed a letter of intent. FUNDEP is a foundation for the development of technology and companies in the State of Minas Gerais, Brazil, operating out of the Federal University of Minas Gerais in Belo Horizonte. In the LOI, FUNDEP agreed to support the development of Holt Accelerator Brazil as an investor through its investment arm, FUNDEPAR, as well as to provide introductions to other investors, and also to generally assist in the development of the accelerator, recruitment of companies for acceleration, and the forming of other partnerships necessary to develop the company. On July 26, 2019, Hvide met with Helder Fonseca to further develop the plan for Holt Accelerator Brazil.

161.     On August 5, 2019, GVM Advogados delivered to Jan Arp as CEO of Holt Accelerator Canada and Hvide, designating him CEO of Brazil, their proposal for development of Holt Accelerator and Fund.

162.     On August 14, 2019, while in Miami, Hvide participated in a conference call with Jan Arp regarding the progress and strategy for Holt Accelerator Brazil.

163.    On August 21, 2019, Hvide returned to Brazil where he continued to have meetings with potential partners and investors including the government Development Bank of Minas Gerais (BDMG) among others.

164.    On August 22, 2019, Hvide on behalf of Holt Accelerator, Inc. and Alessandro Dadalto on behalf of Invest Center Consultoria Ltda. signed a letter of intent similar in scope and intent to the LOI signed with FUNDEP. Hvide e-mailed a copy of this document, which showed Hvide signing on behalf of Holt Accelerator, Inc., to Brendan Dunn and Jan Arp. Brendan Dunn responded, "Awesome news!" Jan Arp responded, "Keep on rollin' partner!! Well done Leif."

165.    On August 22 and 23, 2019, Hvide on behalf of Holt Accelerator, Inc. and CHRONUS Technologia e Automacao Ltda, signed a letter of intent of the same scope and intent as FUNDEP. Hvide e-mailed Brendan Dunn a copy of this agreement, which showed Hvide signing on behalf of Holt Accelerator, Inc., to which Brendan Dunn responded, "Keep it going!"

166.    Chronus would go on to play a crucial role in the development of Holt Accelerator Brazil, assisting Hvide in developing advantageous business relationships with government and investors in Espirito Santo.

167.    At this time, Hvide was given approval to proceed with the proposal from GVM Aand on August 26, 2019, Hvide held a conference call with GVM to discuss next steps to proceed.

168.    On August 27, 2019, Brendan Dunn sent a message to Hvide and Jan Arp regarding fundraising for Holt Accelerator Brazil.

169.    On September 5, 2019. Hvide met with Helder Fonseca of GVM to kick off the development of Holt Accelerator Brazil.

170.     On September 5, 2019, GVM sent its first invoice. Brendan Dunn confirmed that this was for Holt Accelerator L.P.'s account so a revised invoice to Holt Accelerator L.P. was later sent on September 26, 2019.

171.     On September 10, 2019, Hvide participated in a conference call with Maggie Dunphy and Jan Arp to discuss the launch requirements.

172.     On September 11, 2019, Brendan Dunn sent an email introducing Hvide as Holdun's "man on the ground in Brazil."

173.     On September 11, 2019, Jan Arp introduced Hvide as the person "heading our Brazilian operations" to Sandra Peloquin from the Canadian Development Bank in order for Hvide to connect Jan Arp with his relationship at BNDES (Brazilian Development Bank).

174.     On September 12, 2019, Hvide had a kick-off meeting with GVM Advogados and executives from Hieron, a multi-billion fund manager based in Sao Paulo to pitch the Holt Accelerator Brazil fund and gauge Hieron's interest in acting as a manger and fundraising agent for the fund.

175.     On September 16, 2019, Maggie Dunphy asked Hvide to provide her with additional information on LOIs that had been signed as well as promising to come back from Holt Accelerator Canada's lawyers with a response on which entity would be participating in Holt Accelerator Brazil.

176.     On September 18, 2019, Hvide returned to Miami and continued working on Holt Accelerator Brazil with Marc Bonorino.

177.     On September 19, 2019, Hieron delivered to Hvide and GVM its proposal for managing the fund for Holt Accelerator Brazil. This proposal was discussed between Hvide, Brendan Dunn, Maggie Dunphy, Jan Arp, and Marc Bonorino in Miami.

178.    On September 23, 2019, Marc Bonorino confirmed to GVM that Holt Accelerator L.P. would be sending the wire transfer for GVM's invoice.

179.    In subsequent emails on September 23, 2019, between GVM, Maggie Dunphy, Marc Bonorino, Jan Arp, Brendan Dunn, and Hvide, Maggie Dunphy confirmed that she and Marc Bonorino would be together all week preparing documents requested by GVM to open Holt Accelerator Brazil.

180.    On September 27, 2019, Jan Arp invited Hvide to assist in the preparation of the investor presentation for Holt Accelerator Canada's fund.

181.    During this time, Maggie Dunphy spent approximately one week in Miami with Marc Bonorino working on Holt Accelerator Brazil.

182.     On October 16 and 17, 2019, Jan Arp from his Holt Accelerator e-mail address and Maggie Dunphy from her Holdun Family Office Canada e-mail address, and Hvide from his Holt Accelerator e-mail address, exchanged e-mails concerning the approval of payments to Hvide for "Expenses related to opening the company, the fund, work visas, and preparing the offering."

183.    On October 18, 2019, Hvide was in Brazil to meet with the Vice Governor of Espirito Santo, Jaqueline Moraes, her cabinet, as well as with Secretary of State for Development, Marcos Navarro, the Secretary of Investments and International Business, Gabriel Feitosa, the Preseident of FAPES (government fund for development of technology) Denio Arantes, the Director of FAPES, Elton Moura, the Chief Economist for Banestes (Espirito Santo's government development bank), Eduarda La Rocque, the President of the Brazilian Institute of Executive Finance, Alessandro Dadalto, as well as Augusto Brunow from Chronus.

184.    On October 23, 2019, Maggie Dunphy wired fees to GVM from Holt Accelerator L.P.

185.     On October 24, Hvide had follow-up structuring and strategy meetings in Sao Paulo with Hieron and GVM.

186.     In late October 2019, Hvide was scheduled to return to Miami in time for his son's third birthday but was required to stay in Brazil to meet with the Vice-Governor of Espirito Santo to finalize an accord with the government which would cement its investment into Holt Accelerator Brazil. Missing his son's birthday put a great deal of emotional strain on Hvide and led to further alienation from his children and spouse. Hvide's spouse filed for divorce two weeks later on November 12, 2019.

187.     On October 30, 2019, Hvide and GVM met with the President and team of the Development Bank of Minas Gerais to cement their strategic and financial support for Holt Accelerator.

188.     On November 1, 2019, Marc Bonorino on behalf of Holt Financial and Hvide on behalf of Holt Accelerator signed a letter of intent with the governor of Espirito Santo. Parties to this accord included the Secretary of State, Alvaro Duboc, Director of Innovation, Elton Moura, Secretary of Investment, Gabriel Feitosa, Special Director Carlos Santos, Special Director of Relations, Odmar Nascimento, Augusto Brunow, Alessandro Dadalto, and others. This accord committed the Government of Espirito Santo to support and invest in the launch of the accelerator and fund.

189.     On November 6, Hvide held follow-up presentations with the development bank, sovereign wealth fund, and other government agencies in Espirito Santo to bring in additional financial commitments.

190.     On November 8, 2019, Hvide on behalf of Holt Accelerator Inc. with the approval of Brendan Dunn secured the services of Hieron to provide the fund administration and fundraising

services for the Brazil Accelerator Equity Investment Fund's structuring, implementation, management and distribution of shares.

191.    On November 14, 2019, Hvide had another follow-up meeting with the government of Espirito Santo and FAPES. During this meeting, they gave Hvide verbal commitments that they would match two-to-one every dollar invested by Holt entities into the Holt Brazil Accelerator. That same day, Hvide met with the President of Investor Partners, Alessandro Dadalto, who committed to raise R$10 million (approximately USD $2mm) for the Accelerator.

192.    Hvide conveyed this information to Brendan Dunn on November 14, 2019, confirming that Brendan would need to raise at least R$5 million (USD $1.2m) from Holt. Brendan replied that this "[w]on't be a problem."

193.    On November 18, 2019, Hvide met with Pedro Vaa, the head of development for the Government of Minas Gerais to secure additional support in the region.

194.    Hvide returned to Miami on November 24, 2019, and worked with Marc Bonorino and others on the ownership structure of Holt Accelerator Brazil over the following weeks.

195.    On November 21, 2019, Jan Arp e-mailed Hvide a presentation representing Hvide as part of the Holt Accelerator Team, with the designation, "Head, International."

**I.    Hvide is forced to release his shares in Holt Financial, but secures promises from Brendan Dunn.**

196.    On October 2, 2019, after Hvide had secured most of the letters of intent for the Holt Accelerator Brazil, Daniel Casanas told Hvide he needed to sign a deed of release of his shares in Holt Financial, Ltd., in exchange for the issuance of 1,000 Shares in Holt Digital Finance Ltd. and 1,000 Shares in Holt Marketplace Ltd., which are subsidiary companies of Holt Financial, Ltd.

197.   On October 11, 2019, Daniel Casanas asked Hvide again to sign the deed of release and provide it to Kelly Nottage as "we need to close the round and investors are asking for their shares." Hvide asked Daniel Casanas why he was being forced to give up his shares. Daniel Casanas directed Hvide to discuss this with Brendan Dunn.

198.   At the time, Hvide's 4% stake in Holt Financial was worth $4,000,000.00 as evidenced by third party investments into Holt Financial at 1.0% for $1,000,000.00.

199.   At this time, the shares in the subsidiary companies had no known value.

200.   No reason was given for this demand to sign the deed of release. But Hvide was advised by Daniel Casanas that if he did not sign the release he would lose his job and Brendan Dunn would get the shares somehow anyway.

201.   Just like when he was ousted as CEO of Dunrok, and cut off from Holdun Real Estate Fund, without any real explanation given, this was another dictate handed down from Brendan Dunn, and Hvide was expected to accept it.

202.   But Hvide had put in such tremendous work into the Brazil Accelerator project, that he was not going to simply accept this.

203.   On October 20, 2019, Kelly Nottage wrote to Hvide asking to schedule a call to discuss the deed of release. This call took place between Hvide and Nottage, during which Hvide asked Nottage why he was being forced to give up his shares. Nottage directed Hvide to discuss this question with Brendan Dunn, as Nottage was only authorized to discuss the legal terms of the deed of release.

204.   On November 20, 2019, Hvide had a phone call with Brendan Dunn.

205.   On this phone call, Hvide asked Brendan Dunn, and Brendan Dunn agreed, that in exchange for Hvide signing the deed of release, Brendan Dunn would (1) commit to open the fund

and accelerator in Brazil; and (2) continue paying Hvide's salary, health insurance, and travel expenses.

206.    Hvide confirmed this agreement in a contemporaneous e-mail to Brendan Dunn.

207.    Brendan Dunn did not say on whose behalf he was making this commitment. He did not need to. He is the CEO of both Holt Financial, Ltd. and Holdun Family Office, a Founder and Managing Partner of Holt Accelerator, and an officer or director of Holt Accelerator, L.P. He is the great-grandson of Sir Herbert Holt and a member of the charmed circle of Holt descendants who control their business empire. His agreement with Hvide was his own personal agreement, which was the same as a commitment on behalf of the companies he ran or helped control, and on whose behalf Hvide labored.

208.    The next day, on November 21, 2019, an attorney from GVM Advogados e-mailed Maggie Dunphy, Marc Bonorino, and Hvide a presentation of the suggested corporate structure of Holt Accelerator Brazil, and Holt Investment Fund Brazil—a fund contemplated to be set up to be part of the Brazil Accelerator deal.

209.    It was Hvide's understanding that under Brazilian law, all managers and directors of Brazilian investment funds must be residents of Brazil. As Hvide was applying for permanent residency as part of the accelerator set-up process and as Marc Bonorino is a Brazilian citizen, it was determined that they would be the designated managers and directors of the fund and managers of the Accelerator.

210.    On November 26, 2019, there was a Holt Accelerator Board call, which included Hvide, Jan Arp, Margaret Dunphy, Brenan Dunn, and others. Hvide attended this call from Miami, where he presented the latest developments and success of Holt Accelerator Brazil.

211.     On November 27, 2019, Maggie Dunphy e-mailed Hvide from her holdun.com e-mail address, as CFO of Holdun Family Office Canada, Inc., giving him instructions related to his budget for work on the Brazil Accelerator project.

212.     On December 6, 2019, Hvide sent an e-mail to Marc Bonorino, Jan Arp, Brendan Dunn, and Margaret Dunphy, with a slightly revised presentation of the structure of the Brazil Accelerator and fund.

213.     Later that day, Hvide and Marc Bonorino, operating from Miami, had a phone call with Maggie Dunphy, Jan Arp, and Brendan Dunn. On that call, all parties agreed to the corporate and economic deal structure for Holt Accelerator Brazil as presented in Hvide's e-mail.

214.     Holt Accelerator Brazil was targeted to be R$200 million in size. Gross expected returns for the fund according to Jan Arp's own calculations were 2.62 times the investment, or R$524 million. The performance fee on this return is 20%, equal to R$104 million. 25% of that, equal to R$31 million (USD$6 million) was expected to flow to Hvide.  Also, throughout the life of the fund, Hvide was expected to earn a salary as manager of the fund equal to $198,000 yearly or at least $1,980,000.00 over the ten-year life of the fund.

215.     Five days later, on December 11, 2019, Brendan Dunn emailed Hvide from his e-mail address as CEO of Holdun Family Office (Bahamas) Limited, asking (in regards to the deed of release) "are we ready to sign this"?

216.     Hvide subsequently transmitted the signed deed of release to Brendan Dunn. In the transmittal e-mail, Hvide stated the terms of the agreement:

> 1. I have your commitment and support to open the fund and accelerator in Brasil in line with the structure agreed to last week. 2. My position in Brasil, which includes maintaining my salary, health insurance, and paying travel expenses will continue until such time as the organization here is self-supporting. Noting that all monies advanced to startup the operation here need to be put into a loan agreement for repayment."

217.     Hvide never received any confirmation or evidence of receiving the 1,000 Shares in Holt Digital Finance Ltd. and 1,000 Shares in Holt Marketplace Ltd. referenced in the deed of release.

218.     On December 10, 2019, Hvide and Chronus led follow-up meetings with Eduarda La Rocque, Chief Economist for the State Bank of Espirito Santo, Victo Murad, General Manager of Innovation and Technology for the Government of Espirito Santo, Elton Moura, the Director of Innovation for the Espirito Santo Fund for Research and Innovation.

219.     On December 10, 2019, Hvide signed an accord with the aforementioned government funds and banks of Espirito Santo, Brazil to bring Holt Accelerator to Espirito Santo, which included government investment matching into the Holt Accelerator.

220.     On December 13, 2019, Hvide provided to Brendan Dunn the deck he requested in English for Holt Accelerator Brazil.

221.     On December 20, 2019, Hvide returned to Miami to spend the holidays with his parents and children. This visitation with Hvide's children required weeks of negotiations with Mrs. Hvide's lawyers at a cost of thousands of dollars and a great deal of emotional stress to Hvide.

222.     During this time in Miami, as during all of his time in Miami, Hvide continued to work on the Brazil Accelerator and other matters for the Holt entities and Brendan Dunn.

223.     On January 16, 2020, Donovan Braynen, head of IT for Holdun Family Office (Bahamas) Limited, e-mailed Hvide with instructions on the use of a central database.

224.     Throughout this time, there was a weekly Zoom call of Holt Accelerator executives to provide updates on the status of the project.

225.    On January 18, 2020, Jan Arp, as managing partner of Holt Accelerator, sent Hvide an e-mail bearing the subject line, "Holt Accelerator Salary," telling Hvide "we are taking over your compensation" and asking him to call him to discuss.

226.    On January 19, 2020, Jan Arp, from his Holt Accelerator e-mail address, invited Hvide and Maggie Dunphy to a meeting to discuss Hvide's "Accelerator Invoices."

227.    On January 3, 2020, Holt Accelerator, L.P. registered to do business in Brazil.

228.    On January 24, 2020, Jan Arp e-mailed Hvide a draft offering memorandum for Holt Accelerator Canada Fund, listing Hvide as a member of the Holt Accelerator Team, with the title, "International Development."

229.    In early February 2020, Marc Bonorino flew down to Brazil to help Hvide prepare for the "roadshow" for the Brazil Accelerator. The "roadshow," which was due to start in mid-March 2020, refers to the scheduled process of meeting with the various investors and stakeholders to formalize and finalize their investments into the Accelerator or fund to enable them to be formally set up.

230.    On February 5, 2020, Brendan Dunn, as CEO of Holdun Family Office, e-mailed Hvide, instructing him to call Donovan Braynen (head of IT for Holdun Family Office, Bahamas), because he "needs to review your laptop and install necessary software to ensure your computer meets our policies for all employees."

231.    On February 7, 2020, Jan Arp asked Hvide to edit language for the "commentary for the Q4 Opportunity Fund." Hvide was asked to input commentary on the development of Holt Accelerator Brazil. For this reason, Hvide believes the Opportunity Fund was financially supporting some or all of the Holt entities involved in the Holt Brazil Accelerator.

**J. The Defendants Unceremoniously Cut Hvide off for the last time, with No Explanation Given**.

232.    In the last week of February 2020, Hvide's access to his e-mail accounts was unceremoniously shut off.

233.    At this point in time, the Brazil project was nearly ready to be finalized. The roadshow was scheduled for mid-March, GVM Advogados had all the paperwork ready to form the necessary entities per the agreed-upon structure, and meetings were scheduled with GVM and Hieron to finalize the offering documents.

234.    Hvide tried contacting GVM, but was told they were not allowed to speak with him about the Brazil accelerator project anymore.

235.    On March 30, 2020, Hvide received his last paycheck.

236.    In May 2020, Leif found out his health insurance was cancelled. None of the defendants gave him advanced notice of the cancellation, nor the opportunity for alternative insurance, nor the continuation of insurance coverage through COBRA.

## <u>COUNT 1—BREACH OF CONTRACT</u>

(Against Brendan Dunn, Holt Financial, Ltd., Holt Accelerator, Inc., Holt Accelerator, L.P., and Holdun Family Office)

237.    Hvide incorporates paragraphs 1 through 236 as if fully set forth herein.

238.    Hvide entered into a contract with Brendan Dunn, acting on behalf of himself, Holt Financial, Ltd., Holt Accelerator, Inc., and Holdun Family Office.

239.    Brendan Dunn, in his aforementioned capacities, committed to support and open the fund and accelerator in Brazil, and to protect and maintain Hvide's position in the organization, inclusive of his salary, American health insurance, and travel expenses to Brazil until the Brazilian operation became self-supporting.

240.    In exchange, Hvide signed the deed of release, releasing his Class A shares in Holt Financial Ltd.

241.    Subsequently, on a December 6, 2019, conference call attended by Hvide and Marc Bonorino from Miami, representatives of Holt Accelerator, Holdun Family Office, and Holt Financial, Ltd. agreed to the specifics of the Brazil accelerator and fund, as outlined in writing by GVM Advogados and as modified in a subsequent writing by Hvide.

242.    Hvide subsequently confirmed this agreement in writing to Brendan Dunn in the same e-mail transmitting the deed of release, specifically noting the corporate structure agreed to on the December 6, 2019, call.

243.    Hvide substantially performed the agreement, transmitting the deed of release and organizing and preparing the accelerator and fund, such that it was on the precipice of being consummated.

244.    Brendan Dunn, Holt Financial, Ltd., Holt Accelerator, Inc., Holt Accelerator, L.P., and Holdun Family Office, breached the agreement with Hvide.

245.    In the week of February 17, 2020, Hvide was unceremoniously terminated without cause or reason: his e-mail accounts shut off and his access to the companies and personnel denied—with his salary and health insurance later to be stopped. He is cut out of the deal.

246.    As a result, Hvide was damaged in an amount greater than $8 million.

247.    Although he received a salary through the end of March 2020, he has been cut out of the organization, including being deprived of his future share and stake in the future Brazilian operation as expressly contemplated and agreed to.

248.    Alternatively, Hvide was deprived of his Class A Shares in Holt Financial, Ltd. without receiving the promised-for consideration in exchange.

**WHEREFORE**, Plaintiff, Leif-Erik Hvide, demands the entry of a judgment for damages in an amount greater than $8 million, costs, and prejudgment interest against the defendants named in this count, and for any such other and further relief that this Court deems just and proper.

### COUNT 2—UNJUST ENRICHMENT

(Against Brendan Dunn, Holt Financial, Ltd., Holt Accelerator, Inc., Holt Accelerator, L.P., and Holdun Family Office)

249.     Hvide incorporates paragraphs 1 through 236 as if fully set forth herein.

250.     Through months of effort, constant travels from Florida to Brazil, Canada, and The Bahamas, as well as the forging of substantial relationships with private and governmental actors in Florida and Brazil, securing legal and other professional support, and setting up the Brazil accelerator and fund transaction up to the precipice of completion, Hvide has conferred a benefit on Brendan Dunn, Holt Financial, Ltd., Holt Accelerator, Inc., Holt Accelerator, L.P., and Holdun Family Office.

251.     Those defendants have voluntarily accepted and retained the benefit conferred.

252.     The circumstances are such that it would be inequitable for the defendants to retain the benefit without making compensation to Hvide therefor.

**WHEREFORE**, Plaintiff, Leif-Erik Hvide, demands the entry of a judgment for damages in an amount greater than $8 million, costs, and prejudgment interest against the defendants named in this count, and for any such other and further relief that this Court deems just and proper.

### COUNT 3—FRAUDULENT INDUCEMENT

(Against Brendan Dunn, Margaret Dunphy, Jan Arp, Holt Financial, Ltd., Holt Accelerator, Inc., Holt Accelerator, L.P., and Holdun Family Office)

253.     Hvide incorporates paragraphs 1 through 236 as if fully set forth herein.

254.     Brendan Dunn, Margaret Dunphy, Jan Arp, Holt Financial, Ltd., Holt Accelerator, Inc., Holt Accelerator, L.P., and Holdun Family Office made false statements to Hvide concerning material facts; i.e., that they had the present intention to fund and support the Brazil accelerator and fund, as well as Mr. Hvide's salary and position in the organization.

255.     These defendants also falsely agreed to the corporate and economic structure of the Brazil accelerator and fund as outlined in GVM's and Hvide's written correspondence.

256.     In fact, Brendan Dunn, Holt Financial, Ltd., Holt Accelerator, Inc., Holt Accelerator, L.P., and Holdun Family Office knew these representations to be false. At the time of making them in December 2019 while Hvide was operating out of Florida, these defendants knew and had the intention of inducing Hvide to bring the accelerator and fund right up to the finish line, only to cut him off, with the intention of enriching the Holt entities and themselves.

257.     Hvide reasonably and justifiably relied on these defendants' false statements, to his detriment.

258.     In the week of February 17, 2020, Hvide was unceremoniously terminated without cause or reason: his e-mail accounts shut off and his access to the companies and personnel denied—with his salary and health insurance to be stopped.

259.     As a result, Hvide was damaged in an amount greater than $8 million.

260.     Although he received a salary through the end of March 2020, he has been cut out of the organization, deprived of his future share and stake in the organization as expressly contemplated and agreed to.

261.     Alternatively, Hvide was deprived of his Class A Shares in Holt Financial, Ltd. without receiving the promised-for consideration in exchange.

262.     As a direct and proximate result of these defendants' fraudulent inducement, Hvide has also suffered great emotional pain and suffering, and reputational damage.

**WHEREFORE**, Plaintiff, Leif-Erik Hvide, demands the entry of a judgment for damages in an amount greater than $8 million, costs, and prejudgment interest against the defendants named in this count, and for any such other and further relief that this Court deems just and proper.

<u>**COUNT 4—CIVIL CONSPIRACY TO DEFRAUD**</u>

(Against Brendan Dunn, Margaret Dunphy, Jan Arp, Holt Financial, Ltd., Holt Accelerator, Inc., Holt Accelerator, L.P., and Holdun Family Office)

263.     Hvide incorporates paragraphs 1 through 236 as if fully set forth herein.

264.     Brendan Dunn, Margaret Dunphy, Jan Arp, Holt Financial, Ltd., Holt Accelerator, Inc., Holt Accelerator, L.P., and Holdun Family Office acted in concert and had an agreement among one another to defraud Hvide as described above.

265.     They did so through the fraudulent misrepresentations described above.

266.     As a result, Hvide was damaged in an amount greater than $8 million.

267.     Although he received a salary through the end of March 2020, he has been cut out of the organization, deprived of his future share and stake in the organization as expressly contemplated and agreed to.

268.     Alternatively, Hvide was deprived of his Class A Shares in Holt Financial, Ltd. without receiving the promised-for consideration in exchange.

269.     As a direct and proximate result of these defendants' conspiracy to defraud, Hvide has also suffered great emotional pain and suffering, and reputational damage.

**WHEREFORE**, Plaintiff, Leif-Erik Hvide, demands the entry of a judgment for damages in an amount greater than $8 million, costs, and prejudgment interest against the defendants named in this count, and for any such other and further relief that this Court deems just and proper.

## COUNT 5—TORTIOUS CIVIL CONSPIRACY

(Against Brendan Dunn, Margaret Dunphy, Jan Arp, Gordon Dempsey, Holt Financial, Ltd.,
Holt Accelerator, Inc., Holt Accelerator, L.P., and Holdun Family Office)

270.    Hvide incorporates paragraphs 1 through 236 as if fully set forth herein.

271.    Brendan Dunn, Margaret Dunphy, Jan Arp, Holt Financial, Ltd., Holt Accelerator, Inc., Holt Accelerator, L.P., and Holdun Family Office, acting in unison, exercised a peculiar power of coercion over Hvide by virtue of their combination, that any one of them individually would not possess.

272.    In combination, these defendants ingratiated Hvide, enveloping him into the family of Holt entities, making him feel like he was "part of the family."

273.    He was made to work for all of the Holt entity defendants, made to understand that his efforts were not only on behalf of his ostensible employer (first Holt Financial, Ltd, then Holt Accelerator), but on behalf of the larger Holt empire and family.

274.    Throughout his relationship with Brendan Dunn and the rest of these defendants, they would exercise control and dominion over his life in dramatic and significant ways.

275.    They sent Hvide to Brazil, to upend his life by constant travel to pursue projects on behalf of the Holt empire and family, learning a new language and straining his family life.

276.    Hvide toiled for months to forge relationships with government and private actors, at great personal reputational risk.

277.    Throughout his relationship with Brendan Dunn and the rest of these defendants, they would hand down unexplained dictates that would greatly, negatively impact Hvide.

278.    These included the initial, unexplained decision to remove him as CEO of Dunrok, and re-install him in a different position with less salary, shares, and status, while installing none other than Brendan Dunn as CEO.

279.    And these included the unexplained demand that Hvide release his shares in Holt Financial.

280.    These finally culminated in Hvide's unexplained, unceremonious termination, without communication, cause, or explanation.

281.    The only plausible explanation, given the defendants' past behavior, the almost-consummated state of the deal, and the circumstances of Hvide's termination, is that they simply decided they had no more use for Hvide. He had done all of the work, and could now be cut off and cut out, with all of the benefits of his labor and the transaction going to the defendants, and none to Hvide.

282.    Thus acting in concert and upon Hvide, by so exercising a peculiar power of coercion over him to his detriment, the defendants have committed an actionable, independent wrong.

283.    As a result, Hvide was damaged in an amount greater than $8 million.

284.    Although he received a salary through the end of March 2020, he has been cut out of the organization, deprived of his future share and stake in the organization as expressly contemplated and agreed to.

285.    Alternatively, Hvide was deprived of his Class A Shares in Holt Financial, Ltd. without receiving the promised-for consideration in exchange.

286.    As a direct and proximate result of these defendants' tortious civil conspiracy, Hvide has also suffered great emotional pain and suffering, and reputational damage.

**WHEREFORE**, Plaintiff, Leif-Erik Hvide, demands the entry of a judgment for damages in an amount greater than $8 million, costs, and prejudgment interest against the defendants named in this count, and for any such other and further relief that this Court deems just and proper.

## COUNT 6—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against all Defendants)

287.    Hvide incorporates paragraphs 1 through 236 as if fully set forth herein.

288.    In exercising a peculiar power of coercion over Hvide by virtue of their combination, including repeatedly having him create and work up to near-completion various enterprises, under promises of shares, equity, or other participation, as well as threats and economic pressure, only to cut him off, all the while causing him to uproot his life and circumstances, Defendants' conduct was intentional or reckless, in that they knew or should have known that emotional distress would likely result.

289.    The Defendants in fact knew severe emotional distress would and indeed did result from their actions, insofar as Hvide informed them or they were otherwise aware of his personal, family, and financial problems caused by their actions, but nevertheless continued their conduct.

290.    Defendants' conduct was outrageous; that is, as to go beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized community.

291.    Defendants' conduct caused Hvide severe emotional distress.

292.    As a direct and proximate result, Hvide has suffered damages in excess of the Court's jurisdictional amount, including damages caused by great emotional pain and suffering, and reputational damage.

**WHEREFORE**, Plaintiff, Leif-Erik Hvide, demands the entry of a judgment for damages, costs, and prejudgment interest against the defendants named in this count, and for any such other and further relief that this Court deems just and proper.

## COUNT 7—TORTIOUS INTERFERENCE
### (Alternative Count against Brendan Dunn, Margaret Dunphy, and Jan Arp)

293.    Hvide incorporates paragraphs 1 through 236 as if fully set forth herein.

294.     Hvide had contractual and business relationships with the Holt-Dunn family for nearly two years, where he lived and worked in Miami, from the start of Digital Asset Management in Wynwood, to the office in Brickell, under the terms of which he had legal rights, namely that he was going to be a partner in the Brazil accelerator and fund, under terms and conditions agreed to on the December 6, 2019, phone call that Marc Bonorino and Hvide attended from Miami and as confirmed in contemporaneous writings.

295.     Hvide also had contractual and business relationships with Holt Financial, Holt Accelerator, Holt Accelerator, L.P., and Holdun Family Office, in that he worked on all of their behalf, for which Brendan Dunn, acting in various capacities, promised Hvide's salary and position, and the funding and support for the Brazil accelerator and fund.

296.     Hvide also had business relationships with many private and governmental parties, with whom Hvide executed letters of intent and other agreements.

297.     Though Hvide executed most of these LOIs on behalf of Holt Accelerator, these agreements and relationships were directly to Hvide's benefit, insofar as they were being secured to invest in and fund the deal of which he was to be a partner with Holt Accelerator.

298.     Brendan Dunn, Margaret Dunphy, and Jan Arp intentionally interfered with Hvide's relationships, without justification, by inducing Holt Financial, Holt Accelerator, Holt Accelerator, L.P., and Holdun Family Office to terminate Hvide from their employ and by inducing Holt Accelerator to cut Hvide off from and out of the Brazil accelerator deal.

299.     Brendan Dunn, Margaret Dunphy, and Jan Arp did so with ulterior purposes, namely their own personal enrichment or to secure their own positions by obeying Brendan Dunn's dictates, without an honest belief that their actions would benefit the entities for which they worked.

300.    Their conduct was in fact not in the best interests of the entities for which they worked.

301.    As a result, Hvide was damaged in an amount greater than $8 million, including emotional pain and suffering, and reputational damage.

**WHEREFORE**, Plaintiff, Leif-Erik Hvide, demands the entry of a judgment for damages in an amount greater than $8 million, costs, and prejudgment interest against the defendants named in this count, and for any such other and further relief that this Court deems just and proper.

### COUNT 8—TORTIOUS INTERFERENCE

(Alternative count against Holt Financial, Ltd. and Holdun Family Office)

302.    Hvide incorporates paragraphs 1 through 236 as if fully set forth herein.

303.    Hvide had a contractual and business relationship with Holt Accelerator, under the terms of which he had legal rights, namely that he was going to partner in the Brazil accelerator and fund, under terms and conditions agreed to on the December 6, 2019, phone call and as confirmed in contemporaneous writings.

304.    Hvide also had advantageous business relationships with many private and governmental parties, with whom Hvide executed letters of intent and other agreements.

305.    Though Hvide executed most of these LOIs on behalf of Holt Accelerator, these agreements and relationships were directly to Hvide's benefit, insofar as they were being secured to invest in and fund the deal of which he was to be a partner with Holt Accelerator.

306.    Holt Financial, Ltd. and Holdun Family Office intentionally interfered with Hvide's relationship with Holt Accelerator, without justification, by inducing Holt Accelerator to terminate Hvide from their employ and by inducing Holt Accelerator to cut Hvide off from and out of the Brazil accelerator deal.

307.     As a result, Hvide was damaged in an amount greater than $8 million, including emotional pain and suffering, and reputational damage.

**WHEREFORE**, Plaintiff, Leif-Erik Hvide, demands the entry of a judgment for damages in an amount greater than $8 million, costs, and prejudgment interest against the defendants named in this count, and for any such other and further relief that this Court deems just and proper.

### COUNT 9—DECLARATORY RELIEF
(Against all Defendants)

308.     Hvide incorporates paragraphs 1 through 236 as if fully set forth herein.

309.     Hvide is in doubt as to his rights and status under his agreement with Brendan Dunn, in which Hvide signed a deed of release, releasing his Class A shares in Holt Financial Ltd., and in which Dunn committed to support and open the fund and accelerator in Brazil, and to protect and maintain Hvide's position in Brazil, inclusive of his salary, health insurance, and travel expenses until the Brazil fund and accelerator became self-supporting.

310.     Subsequently, on a December 6, 2019, telephone conference, representatives of Holt Accelerator, Holdun Family Office, and Holt Financial, Ltd., and Holt Accelerator L.P., agreed to the specifics of the Brazil accelerator and fund, as outlined in writing by GVM Advogados and as modified in a subsequent writing by Hvide.

311.     Hvide subsequently confirmed this agreement in writing to Brendan Dunn in the same e-mail transmitting the deed of release, specifically noting the corporate structure agreed to on the December 6, 2019, call.

312.     Several uncertainties arise from this agreement, including the capacities in which Brendan Dunn made this agreement, the fact that Hvide never received any confirmation of receiving the 2000 shares contemplated in the deed of release, and the fact that Hvide was ultimately cut off from and out of the Brazil accelerator deal, thereby putting into question whether

the agreement fails for lack of consideration and Hvide should be compensated for the then-present value of the shares of Holt Financial, Ltd. that he ostensibly released.

313.    Hvide is entitled to a declaration as to his rights and status under this agreement, and to have these doubts removed, including a declaration:

A.  Of the capacities in which Brendan Dunn made this agreement.

B.  Whether Hvide is entitled to receive back or be compensated for the value of his Holt Financial shares by virtue of the fact that he was cut out of the Brazil Accelerator deal in consideration for which he gave up the shares.

C.  Whether Hvide is entitled to receive back or be compensated for the value of his Holt Financial shares by virtue of the fact that he was cut out of the Brazil Accelerator deal in consideration for which he gave up the shares.

D.  Whether Hvide is entitled to receive or be compensated for the value of the 2000 shares contemplated in the deed of release.

E.  Whether Dunn or any of the other defendants on whose behalf he may have made the agreement is required to consummate the Brazil accelerator deal as agreed to on the March December 6, 2019, phone call or to compensate Hvide for the value of this lost opportunity.

314.    There is a bona fide, actual, present practical need for the declaration.

315.    The declaration deals with a present, ascertained or ascertainable state of facts or present controversy as to a state of facts.

316.    Some immunity, power, privilege or right of Hvide's is dependent upon the facts or the law applicable to the facts.

317.    The Defendants have, or reasonably may have an actual, present, adverse and antagonistic interest in the subject matter, either in fact or law.

318.    The relief sought is not merely the giving of legal advice by the courts or the answer to questions propounded from curiosity.

**WHEREFORE**, Plaintiff, Leif-Erik Hvide, demands the entry of a judgment declaring the rights and status of Hvide and the defendants named in this count, and for any such other and further relief that this Court deems just and proper.

### RESERVATION OF RIGHT TO PLEAD PUNITIVE DAMAGES

Hvide hereby reserves the right to amend or seek leave to amend this complaint to add claims for punitive damages.

### JURY TRIAL DEMANDED

Hvide demands a jury trial on all matters so triable.

WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
*Counsel for Plaintiff*
2525 PONCE DE LEON BOULEVARD
SUITE 700
CORAL GABLES, FLORIDA 33134
PHONE NO. (305) 854-0800
FACSIMILE NO. (305) 854-2323

By:    /s/ Alan K. Fertel
**Alan K. Fertel**
Florida Bar No. 435066
Primary e-mail address: afertel@wsh-law.com
Secondary e-mail address: isevilla@wsh-law.com
**Richard B. Rosengarten**
Florida Bar No.0106169
Primary e-mail     address: rrosengarten@wsh-law.com
Secondary e-mail address: szavala@wsh-law.com